Appendix of Statutes and Rules

❖ Sec. 201. Service and charges

   (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

   (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

❖ Sec. 202. Discriminations and preferences
(a) Charges, services, etc.

   It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device,

or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

(b) Charges or services included

Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

(c) Penalty

Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

❖ Sec. 203. Schedules of charges

(a) Filing; public display

Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication between the different points on its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other carrier subject to this chapter when a through route has been established, whether such charges are joint or separate, and showing the classifications, practices, and regulations affecting such charges. Such schedules shall contain such other information, and be printed in such form, and be posted and kept open for public inspection in such places, as the Commission may by regulation require, and each such schedule shall give notice of its effective date; and such common carrier shall furnish such schedules to each of its connecting carriers, and such connecting carriers shall keep such schedules open for inspection in such public places as the Commission may require.

(b) Changes in schedule; discretion of Commission to modify requirements

(1) No change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except

after one hundred and twenty days notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe.

(2) The Commission may, in its discretion and for good cause shown, modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions except that the Commission may not require the notice period specified in paragraph (1) to be more than one hundred and twenty days.

(c) Overcharges and rebates

No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

(d) Rejection or refusal

The Commission may reject and refuse to file any schedule entered for filing which does not provide and give lawful notice of its effective date. Any schedule so rejected by the Commission shall be void and its use shall be unlawful.

(e) Penalty for violations

In case of failure or refusal on the part of any carrier to comply with the provisions of this section or of any regulation or order made by the Commission thereunder, such carrier shall forfeit to the United States the sum of $6,000 for each such offense, and $300 for each and every day of the continuance of such offense.

❖ Sec. 206. Carriers' liability for damages

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter

required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

❖ Sec. 207. Recovery of damages

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

❖ Sec. 251. Interconnection

(a) General duty of telecommunications carriers

  Each telecommunications carrier has the duty--
    (1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and
    (2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

(b) Obligations of all local exchange carriers

  Each local exchange carrier has the following duties:

      (1) Resale

    The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

      (2) Number portability

    The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

      (3) Dialing parity

The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

### (4) Access to rights-of-way

The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

### (5) Reciprocal compensation

The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

## (c) Additional obligations of incumbent local exchange carriers

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

### (1) Duty to negotiate

The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

### (2) Interconnection

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--
    (A) for the transmission and routing of telephone exchange service and exchange access;
    (B) at any technically feasible point within the carrier's network;
    (C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and
    (D) on rates, terms, and conditions that are just,

reasonable, and nondiscriminatory, in accordance with the terms
and conditions of the agreement and the requirements of this
section and section 252 of this title.

### (3) Unbundled access

The duty to provide, to any requesting telecommunications
carrier for the provision of a telecommunications service,
nondiscriminatory access to network elements on an unbundled basis
at any technically feasible point on rates, terms, and conditions
that are just, reasonable, and nondiscriminatory in accordance with
the terms and conditions of the agreement and the requirements of
this section and section 252 of this title. An incumbent local
exchange carrier shall provide such unbundled network elements in a
manner that allows requesting carriers to combine such elements in
order to provide such telecommunications service.

### (4) Resale

The duty--
    (A) to offer for resale at wholesale rates any
telecommunications service that the carrier provides at retail
to subscribers who are not telecommunications carriers; and
    (B) not to prohibit, and not to impose unreasonable or
discriminatory conditions or limitations on, the resale of such
telecommunications service, except that a State commission may,
consistent with regulations prescribed by the Commission under
this section, prohibit a reseller that obtains at wholesale
rates a telecommunications service that is available at retail
only to a category of subscribers from offering such service to
a different category of subscribers.

### (5) Notice of changes

The duty to provide reasonable public notice of changes in the
information necessary for the transmission and routing of services
using that local exchange carrier's facilities or networks, as well
as of any other changes that would affect the interoperability of
those facilities and networks.

### (6) Collocation

The duty to provide, on rates, terms, and conditions that are
just, reasonable, and nondiscriminatory, for physical collocation of
equipment necessary for interconnection or access to unbundled
network elements at the premises of the local exchange carrier,

except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

(d) Implementation

(1) In general

Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

(2) Access standards

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether--
    (A) access to such network elements as are proprietary in nature is necessary; and
    (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

(3) Preservation of State access regulations

In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--
    (A) establishes access and interconnection obligations of local exchange carriers;
    (B) is consistent with the requirements of this section; and
    (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

(e) Numbering administration

(1) Commission authority and jurisdiction

The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State

commissions or other entities all or any portion of such jurisdiction.

(2) Costs

The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

(3) Universal emergency telephone number

The Commission and any agency or entity to which the Commission has delegated authority under this subsection shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance. The designation shall apply to both wireline and wireless telephone service. In making the designation, the Commission (and any such agency or entity) shall provide appropriate transition periods for areas in which 9-1-1 is not in use as an emergency telephone number on October 26, 1999.

(f) Exemptions, suspensions, and modifications

(1) Exemption for certain rural telephone companies

(A) Exemption

Subsection (c) of this section shall not apply to a rural telephone company until (i) such company has received a bona fide request for interconnection, services, or network elements, and (ii) the State commission determines (under subparagraph (B)) that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof).

(B) State termination of exemption and implementation schedule

The party making a bona fide request of a rural telephone company for interconnection, services, or network elements shall submit a notice of its request to the State commission. The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A). Within 120 days after the State commission receives notice of the request, the State commission shall terminate the exemption if the request is not unduly

economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof). Upon termination of the exemption, a State commission shall establish an implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations.

(C) Limitation on exemption

The exemption provided by this paragraph shall not apply with respect to a request under subsection (c) of this section from a cable operator providing video programming, and seeking to provide any telecommunications service, in the area in which the rural telephone company provides video programming. The limitation contained in this subparagraph shall not apply to a rural telephone company that is providing video programming on February 8, 1996.

(2) Suspensions and modifications for rural carriers

A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification--
    (A) is necessary--
        (i) to avoid a significant adverse economic impact on users of telecommunications services generally;
        (ii) to avoid imposing a requirement that is unduly economically burdensome; or
        (iii) to avoid imposing a requirement that is technically infeasible; and

    (B) is consistent with the public interest, convenience, and necessity.

The State commission shall act upon any petition filed under this paragraph within 180 days after receiving such petition. Pending such action, the State commission may suspend enforcement of the requirement or requirements to which the petition applies with respect to the petitioning carrier or carriers.

(g) Continued enforcement of exchange access and interconnection

requirements

On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996, under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996, and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

(h) ``Incumbent local exchange carrier'' defined

(1) Definition

For purposes of this section, the term ``incumbent local exchange carrier'' means, with respect to an area, the local exchange carrier that--
(A) on February 8, 1996, provided telephone exchange service in such area; and
(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or
(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

(2) Treatment of comparable carriers as incumbents

The Commission may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if--
(A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in paragraph (1);
(B) such carrier has substantially replaced an incumbent local exchange carrier described in paragraph (1); and
(C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section.

(i) Savings provision

Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.

❖ Sec. 252. Procedures for negotiation, arbitration, and approval of agreements

(a) Agreements arrived at through negotiation

(1) Voluntary negotiations

Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

(2) Mediation

Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration

(1) Arbitration

During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

(2) Duty of petitioner

(A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning--

(i) the unresolved issues;
(ii) the position of each of the parties with respect to those issues; and
(iii) any other issue discussed and resolved by the parties.

(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

(3) Opportunity to respond

A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

(4) Action by State commission

(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).
(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.
(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

(5) Refusal to negotiate

The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

(c) Standards for arbitration

In resolving by arbitration under subsection (b) of this section any
open issues and imposing conditions upon the parties to the agreement, a
State commission shall--
      (1) ensure that such resolution and conditions meet the
   requirements of section 251 of this title, including the regulations
   prescribed by the Commission pursuant to section 251 of this title;
      (2) establish any rates for interconnection, services, or
   network elements according to subsection (d) of this section; and
      (3) provide a schedule for implementation of the terms and
   conditions by the parties to the agreement.

(d) Pricing standards

      (1) Interconnection and network element charges

   Determinations by a State commission of the just and reasonable
rate for the interconnection of facilities and equipment for
purposes of subsection (c)(2) of section 251 of this title, and the
just and reasonable rate for network elements for purposes of
subsection (c)(3) of such section--
      (A) shall be--
         (i) based on the cost (determined without reference to a
      rate-of-return or other rate-based proceeding) of providing
      the interconnection or network element (whichever is
      applicable), and
         (ii) nondiscriminatory, and

      (B) may include a reasonable profit.

   (2) Charges for transport and termination of traffic

   (A) In general

   For the purposes of compliance by an incumbent local
exchange carrier with section 251(b)(5) of this title, a State
commission shall not consider the terms and conditions for
reciprocal compensation to be just and reasonable unless--
         (i) such terms and conditions provide for the mutual and
      reciprocal recovery by each carrier of costs associated with
      the transport and termination on each carrier's network
      facilities of calls that originate on the network facilities
      of the other carrier; and
         (ii) such terms and conditions determine such costs on

the basis of a reasonable approximation of the additional costs of terminating such calls.

(B) Rules of construction

This paragraph shall not be construed--
(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or
(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

(3) Wholesale prices for telecommunications services

For the purposes of section 251(c)(4) of this title, a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

(e) Approval by State commission

(1) Approval required

Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

(2) Grounds for rejection

The State commission may only reject--
(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) of this section if it finds that--
(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or
(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and

necessity; or

(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) of this section if it finds that the agreement does not meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of this section.

(3) Preservation of authority

Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(4) Schedule for decision

If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

(5) Commission to act if State will not act

If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

(6) Review of State commission actions

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any

case in which a State commission makes a determination under this
section, any party aggrieved by such determination may bring an
action in an appropriate Federal district court to determine whether
the agreement or statement meets the requirements of section 251 of
this title and this section.

(f) Statements of generally available terms

(1) In general

A Bell operating company may prepare and file with a State
commission a statement of the terms and conditions that such company
generally offers within that State to comply with the requirements
of section 251 of this title and the regulations thereunder and the
standards applicable under this section.

(2) State commission review

A State commission may not approve such statement unless such
statement complies with subsection (d) of this section and section
251 of this title and the regulations thereunder. Except as provided
in section 253 of this title, nothing in this section shall prohibit
a State commission from establishing or enforcing other requirements
of State law in its review of such statement, including requiring
compliance with intrastate telecommunications service quality
standards or requirements.

(3) Schedule for review

The State commission to which a statement is submitted shall,
not later than 60 days after the date of such submission--
    (A) complete the review of such statement under paragraph
(2) (including any reconsideration thereof), unless the
submitting carrier agrees to an extension of the period for such
review; or
    (B) permit such statement to take effect.

(4) Authority to continue review

Paragraph (3) shall not preclude the State commission from
continuing to review a statement that has been permitted to take
effect under subparagraph (B) of such paragraph or from approving or
disapproving such statement under paragraph (2).

(5) Duty to negotiate not affected

The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251 of this title.

(g) Consolidation of State proceedings

Where not inconsistent with the requirements of this chapter, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253 of this title, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this chapter.

(h) Filing required

A State commission shall make a copy of each agreement approved under subsection (e) of this section and each statement approved under subsection (f) of this section available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

(i) Availability to other telecommunications carriers

A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

(j) ``Incumbent local exchange carrier'' defined

For purposes of this section, the term ``incumbent local exchange carrier'' has the meaning provided in section 251(h) of this title.


❖ Sec. 415. Limitations of actions

(a) Recovery of charges by carrier

All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after.

(b) Recovery of damages

All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section.

(c) Recovery of overcharges

For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

(d) Extension

If on or before expiration of the period of limitation in subsection (b) or (c) of this section a carrier begins action under subsection (a) of this section for recovery of lawful charges in respect of the same service, or, without beginning action, collects charges in respect of that service, said period of limitation shall be extended to include ninety days from the time such action is begun or such charges are collected by the carrier.

(e) Accrual of cause of action for transmission of message

The cause of action in respect of the transmission of a message shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after.

(f) Enforcement petition

A petition for the enforcement of an order of the Commission for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after.

(g) ``Overcharges'' defined

The term ``overcharges'' as used in this section shall be deemed to mean charges for services in excess of those applicable thereto under the schedules of charges lawfully on file with the Commission.

❖ <u>Sec. 51.307  Duty to provide access on an unbundled basis to network  elements.</u>

(a) An incumbent LEC shall provide, to a requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on terms and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of any agreement, the requirements of sections 251 and 252 of the Act, and the Commission's rules.

   (b) The duty to provide access to unbundled network elements pursuant to section 251(c)(3) of the Act includes a duty to provide a connection to an unbundled network element independent of any duty to provide interconnection pursuant to this part and section 251(c)(2) of the Act.

   (c) An incumbent LEC shall provide a requesting telecommunications carrier access to an unbundled network element, along with all of the unbundled network element's features, functions, and capabilities, in a manner that allows the requesting telecommunications carrier to provide any telecommunications service that can be offered by means of that network element.

   (d) An incumbent LEC shall provide a requesting telecommunications carrier access to the facility or functionality of a requested network element separate from access to the facility or functionality of other network elements, for a separate charge.

   (e) An incumbent LEC shall provide to a requesting telecommunications carrier technical information about the incumbent LEC's network facilities sufficient to allow the requesting carrier to achieve access to unbundled network elements consistent with the requirements of this section.

❖ <u>Sec. 51.313  Just, reasonable and nondiscriminatory terms and conditions</u>

(a) The terms and conditions pursuant to which an incumbent LEC provides access to unbundled network elements shall be offered equally to all requesting telecommunications carriers.

   (b) Where applicable, the terms and conditions pursuant to which an incumbent LEC offers to provide access to unbundled network elements, including but not limited to, the time within which the incumbent LEC provisions such access to unbundled network elements, shall, at a minimum, be no less favorable to the requesting carrier than the terms and conditions under which the incumbent LEC provides such elements to itself.

   (c) An incumbent LEC must provide a carrier purchasing access to unbundled network elements with the pre-ordering, ordering, provisioning, maintenance and repair, and billing functions of the

incumbent LEC's operations support systems.

❖ <u>Sec. 51.319  Specific unbundling requirements.</u>

(a) Local loops. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to the local loop on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part and as set forth in paragraphs (a)(1) through (a)(9) of this section. The local loop network element is defined as a transmission facility between a distribution frame (or its equivalent) in an incumbent LEC central office and the loop demarcation point at an end-user customer premises. This element includes all features, functions, and capabilities of such transmission facility, including the network interface device. It also includes all electronics, optronics, and intermediate devices (including repeaters and load coils) used to establish the transmission path to the end-user customer premises as well as any inside wire owned or controlled by the incumbent LEC that is part of that transmission path.

   (1) Copper loops. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to the copper loop on an unbundled basis. A copper loop is a stand-alone local loop comprised entirely of copper wire or cable. Copper loops include two-wire and four-wire analog voice-grade copper loops, digital copper loops (e.g., DS0s and integrated services digital network lines), as well as two-wire and four-wire copper loops conditioned to transmit the digital signals needed to provide digital subscriber line services, regardless of whether the copper loops are in service or held as spares. The copper loop includes attached electronics using time division multiplexing technology, but does not include packet switching capabilities as defined in paragraph (a)(2)(i) of this section. The availability of DS1 and DS3 copper loops is subject to the requirements of paragraphs (a)(4) and (a)(5) of this section.

   (i) Line sharing. Beginning on the effective date of the Commission's Triennial Review Order, the high frequency portion of a copper loop shall no longer be required to be provided as an unbundled network element, subject to the transitional line sharing conditions in paragraphs (a)(1)(i)(A) and (a)(1)(i)(B) of this section. Line sharing is the process by which a requesting telecommunications carrier provides digital subscriber line service over the same copper loop that the incumbent LEC uses to provide voice service, with the incumbent LEC using the low frequency portion of the loop and the requesting telecommunications carrier using the high frequency portion of the loop. The high frequency portion of the loop consists of the frequency range on the copper loop above the range that carries analog circuit-switched voice transmissions. This portion of the loop includes the features, functions, and capabilities of the loop that are used to establish a

complete transmission path on the high frequency range between the
incumbent LEC's distribution frame (or its equivalent) in its central
office and the demarcation point at the end-user customer premises, and
includes the high frequency portion of any inside wire owned or
controlled by the incumbent LEC.

  (A) Line sharing customers before the effective date of the
Commission's Triennial Review Order. An incumbent LEC
shall provide a requesting telecommunications carrier with the ability
to engage in line sharing over a copper loop where, prior to the
effective date of the Commission's Triennial Review Order, the
requesting telecommunications carrier began providing digital subscriber
line service to a particular end-user customer and has not ceased
providing digital subscriber line service to that customer. Until such
end-user customer cancels or otherwise discontinues its subscription to
the digital subscriber line service of the requesting telecommunications
carrier, or its successor or assign, an incumbent LEC shall continue to
provide access to the high frequency portion of the loop at the same
rate that the incumbent LEC charged for such access prior to the
effective date of the Commission's Triennial Review Order.

  (B) Line sharing customers on or after the effective date of the
Commission's Triennial Review Order. An incumbent LEC shall provide a
requesting telecommunications carrier with the ability to engage in line
sharing over a copper loop, between the effective date of the
Commission's Triennial Review Order and three years after that effective
date, where the requesting telecommunications carrier began providing
digital subscriber line service to a particular end-user customer on or
before the date one year after that effective date. Beginning three
years after the effective date of the Commission's Triennial Review
Order, the incumbent LEC is no longer required to provide a requesting
telecommunications carrier with the ability to engage in line sharing
for this end-user customer or any new end-user customer. Between the
effective date of the Commission's Triennial Review Order and three
years after that effective date, an incumbent LEC shall provide a
requesting telecommunications carrier with access to the high frequency
portion of a copper loop in order to serve line sharing customers
obtained between the effective date of the Commission's Triennial Review
Order and one year after that effective date in the following manner:

  (1) During the first year following the effective date of the
Commission's Triennial Review Order, the incumbent LEC shall provide
access to the high frequency portion of a copper loop at 25 percent of
the state-approved monthly recurring rate, or 25 percent of the monthly
recurring rate set forth in the incumbent LEC's and requesting
telecommunications carrier's interconnection agreement, for access to a
copper loop in effect on that date.

  (2) Beginning one year plus one day after the effective date of the
Commission's Triennial Review Order until two years after that effective

date, the incumbent LEC shall provide access to the high frequency portion of a copper loop at 50 percent of the state-approved monthly recurring rate, or 50 percent of the monthly recurring rate set forth in the incumbent LEC's and requesting telecommunications carrier's interconnection agreement, for access to a copper loop in effect on the effective date of the Commission's Triennial Review Order.

(3) Beginning two years plus one day after effective date of the Commission's Triennial Review Order until three years after that effective date, the incumbent LEC shall provide access to the high frequency portion of a copper loop at 75 percent of the state-approved monthly recurring rate, or 75 percent of the monthly recurring rate set forth in the incumbent LEC's and requesting telecommunications carrier's interconnection agreement, for access to a copper loop in effect on the effective date of the Commission's Triennial Review Order.

(ii) Line splitting. An incumbent LEC shall provide a requesting telecommunications carrier that obtains an unbundled copper loop from the incumbent LEC with the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated at the central office where the loop terminates into a distribution frame or its equivalent. Line splitting is the process in which one competitive LEC provides narrowband voice service over the low frequency portion of a copper loop and a second competitive LEC provides digital subscriber line service over the high frequency portion of that same loop.

(A) An incumbent LEC's obligation, under paragraph (a)(1)(ii) of this section, to provide a requesting telecommunications carrier with the ability to engage in line splitting applies regardless of whether the carrier providing voice service provides its own switching or obtains local circuit switching as an unbundled network element pursuant to paragraph (d) of this section.

(B) An incumbent LEC must make all necessary network modifications, including providing nondiscriminatory access to operations support systems necessary for pre-ordering, ordering, provisioning, maintenance and repair, and billing for loops used in line splitting arrangements.

(iii) Line conditioning. The incumbent LEC shall condition a copper loop at the request of the carrier seeking access to a copper loop under paragraph (a)(1) of this section, the high frequency portion of a copper loop under paragraph (a)(1)(i) of this section, or a copper subloop under paragraph (b) of this section to ensure that the copper loop or copper subloop is suitable for providing digital subscriber line services, including those provided over the high frequency portion of the copper loop or copper subloop, whether or not the incumbent LEC offers advanced services to the end-user customer on that copper loop or copper subloop. If the incumbent LEC seeks compensation from the requesting telecommunications carrier for line conditioning, the requesting telecommunications carrier has the option of refusing, in

whole or in part, to have the line conditioned; and a requesting telecommunications carrier's refusal of some or all aspects of line conditioning will not diminish any right it may have, under paragraphs (a) and (b) of this section, to access the copper loop, the high frequency portion of the copper loop, or the copper subloop.

(A) Line conditioning is defined as the removal from a copper loop or copper subloop of any device that could diminish the capability of the loop or subloop to deliver high-speed switched wireline telecommunications capability, including digital subscriber line service. Such devices include, but are not limited to, bridge taps, load coils, low pass filters, and range extenders.

(B) Incumbent LECs shall recover the costs of line conditioning from the requesting telecommunications carrier in accordance with the Commission's forward-looking pricing principles promulgated pursuant to section 252(d)(1) of the Act and in compliance with rules governing nonrecurring costs in Sec. 51.507(e).

(C) Insofar as it is technically feasible, the incumbent LEC shall test and report troubles for all the features, functions, and capabilities of conditioned copper lines, and may not restrict its testing to voice transmission only.

(D) Where the requesting telecommunications carrier is seeking access to the high frequency portion of a copper loop or copper subloop pursuant to paragraphs (a) or (b) of this section and the incumbent LEC claims that conditioning that loop or subloop will significantly degrade, as defined in Sec. 51.233, the voiceband services that the incumbent LEC is currently providing over that loop or subloop, the incumbent LEC must either:

(1) Locate another copper loop or copper subloop that has been or can be conditioned, migrate the incumbent LEC's voiceband service to that loop or subloop, and provide the requesting telecommunications carrier with access to the high frequency portion of that alternative loop or subloop; or

(2) Make a showing to the state commission that the original copper loop or copper subloop cannot be conditioned without significantly degrading voiceband services on that loop or subloop, as defined in Sec. 51.233, and that there is no adjacent or alternative copper loop or copper subloop available that can be conditioned or to which the end-user customer's voiceband service can be moved to enable line sharing.

(E) If, after evaluating the incumbent LEC's showing under paragraph (a)(1)(iii)(D)(2) of this section, the state commission concludes that a copper loop or copper subloop cannot be conditioned without significantly degrading the voiceband service, the incumbent LEC cannot then or subsequently condition that loop or subloop to provide advanced services to its own customers
without first making available to any requesting telecommunications carrier the high frequency portion of the newly conditioned loop or

subloop.

(iv) Maintenance, repair, and testing. (A) An incumbent LEC shall provide, on a nondiscriminatory basis, physical loop test access points to a requesting telecommunications carrier at the splitter, through a cross-connection to the requesting telecommunications carrier's collocation space, or through a standardized interface, such as an intermediate distribution frame or a test access server, for the purpose of testing, maintaining, and repairing copper loops and copper subloops.

(B) An incumbent LEC seeking to utilize an alternative physical access methodology may request approval to do so from the state commission, but must show that the proposed alternative method is reasonable and nondiscriminatory, and will not disadvantage a requesting telecommunications carrier's ability to perform loop or service testing, maintenance, or repair.

(v) Control of the loop and splitter functionality. In situations where a requesting telecommunications carrier is obtaining access to the high frequency portion of a copper loop either through a line sharing or line splitting arrangement, the incumbent LEC may maintain control over the loop and splitter equipment and functions, and shall provide to the requesting telecommunications carrier loop and splitter functionality that is compatible with any transmission technology that the requesting telecommunications carrier seeks to deploy using the high frequency portion of the loop, as defined in paragraph (a)(1)(i) of this section, provided that such transmission technology is presumed to be deployable pursuant to Sec. 51.230.

(2) Hybrid loops. A hybrid loop is a local loop composed of both fiber optic cable, usually in the feeder plant, and copper wire or cable, usually in the distribution plant.

(i) Packet switching facilities, features, functions, and capabilities. An incumbent LEC is not required to provide unbundled access to the packet switched features, functions and capabilities of its hybrid loops. Packet switching capability is the routing or forwarding of packets, frames, cells, or other data units based on address or other routing information contained in the packets, frames, cells or other data units, and the functions that are performed by the digital subscriber line access multiplexers, including but not limited to the ability to terminate an end-user customer's copper loop (which includes both a low-band voice channel and a high-band data channel, or solely a data channel); the ability to forward the voice channels, if present, to a circuit switch or multiple circuit switches; the ability to extract data units from the data channels on the loops; and the ability to combine data units from multiple loops onto one or more trunks connecting to a packet switch or packet switches.

(ii) Broadband services. When a requesting telecommunications carrier seeks access to a hybrid loop for the provision of broadband services, an incumbent LEC shall provide the requesting

telecommunications carrier with nondiscriminatory access to the time division multiplexing features, functions, and capabilities of that hybrid loop, including DS1 or DS3 capacity (where impairment has been found to exist), on an unbundled basis to establish a complete transmission path between the incumbent LEC's central office and an end user's customer premises. This access shall include access to all features, functions, and capabilities of the hybrid loop that are not used to transmit packetized information.

(iii) Narrowband services. When a requesting telecommunications carrier seeks access to a hybrid loop for the provision of narrowband services, the incumbent LEC may either:

(A) Provide nondiscriminatory access, on an unbundled basis, to an entire hybrid loop capable of voice-grade service (i.e., equivalent to DS0 capacity), using time division multiplexing technology; or

(B) Provide nondiscriminatory access to a spare home-run copper loop serving that customer on an unbundled basis.

(3) Fiber loops. (i) Definitions. (A) Fiber-to-the-home loops. A fiber-to-the-home loop is a local loop consisting entirely of fiber optic cable, whether dark or lit, serving an end user's customer premises or, in the case of predominantly residential multiple dwelling units (MDUs), a fiber optic cable, whether dark or lit, that extends to the multiunit premises' minimum point of entry (MPOE).

(B) Fiber-to-the-curb loops. A fiber-to-the-curb loop is a local loop consisting of fiber optic cable connecting to a copper distribution plant that is not more than 500 feet from the customer's premises or, in the case of predominantly residential MDUs, not more than 500 feet from the MDU's MPOE. The fiber optic cable in a fiber-to-the-curb loop must connect to a copper distribution plant at a serving area interface from which every other copper distribution subloop also is not more than 500 feet from the respective customer's premises.

(ii) New builds. An incumbent LEC is not required to provide nondiscriminatory access to a fiber-to-the-home loop or a fiber-to-the-curb loop on an unbundled basis when the incumbent LEC deploys such a loop to an end user's customer premises that previously has not been served by any loop facility.

(iii) Overbuilds. An incumbent LEC is not required to provide nondiscriminatory access to a fiber-to-the-home loop or a fiber-to-the-curb loop on an unbundled basis when the incumbent LEC has deployed such a loop parallel to, or in replacement of, an existing copper loop facility, except that:

(A) The incumbent LEC must maintain the existing copper loop connected to the particular customer premises after deploying the fiber-to-the-home loop or the fiber-to-the-curb loop and provide nondiscriminatory access to that copper loop on an unbundled basis unless the incumbent LEC retires the copper loops pursuant to paragraph

(a)(3)(iv) of this section.

(B) An incumbent LEC that maintains the existing copper loops pursuant to paragraph (a)(3)(iii)(A) of this section need not incur any expenses to ensure that the existing copper loop remains capable of transmitting signals prior to receiving a request for access pursuant to that paragraph, in which case the incumbent LEC shall restore the copper loop to serviceable condition upon request.

(C) An incumbent LEC that retires the copper loop pursuant to paragraph (a)(3)(iv) of this section shall provide nondiscriminatory access to a 64 kilobits per second transmission path capable of voice grade service over the fiber-to-the-home loop or fiber-to-the-curb loop on an unbundled basis.

(iv) Retirement of copper loops or copper subloops. Prior to retiring any copper loop or copper subloop that has been replaced with a fiber-to-the-home loop or a fiber-to-the-curb loop, an incumbent LEC must comply with:

(A) The network disclosure requirements set forth in section 251(c)(5) of the Act and in Sec. 51.325 through Sec. 51.335; and

(B) Any applicable state requirements.

(4) DS1 loops. (i) Subject to the cap described in paragraph (a)(4)(ii) of this section, an incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS1 loop on an unbundled basis to any building not served by a wire center with at least 60,000 business lines and at least four fiber-based collocators. Once a wire center exceeds both of these thresholds, no future DS1 loop unbundling will be required in that wire center. A DS1 loop is a digital local loop having a total digital signal speed of 1.544 megabytes per second. DS1 loops include, but are not limited to, two-wire and four-wire copper loops capable of providing high-bit rate digital subscriber line services, including T1 services.

(ii) Cap on unbundled DS1 loop circuits. A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 loops to any single building in which DS1 loops are available as unbundled loops.

(iii) Transition period for DS1 loop circuits. For a 12-month period beginning on the effective date of the Triennial Review Remand Order, any DS1 loop UNEs that a competitive LEC leases from the incumbent LEC as of that date, but which the incumbent LEC is not obligated to unbundle pursuant to paragraphs (a)(4)(i) or (a)(4)(ii) of this section, shall be available for lease from the incumbent LEC at a rate equal to the higher of 115% of the rate the requesting carrier paid for the loop element on June 15, 2004, or, 115% of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that loop element. Where incumbent LECs are not required to provide unbundled DS1 loops pursuant to paragraphs (a)(4)(i) or (a)(4)(ii) of

this section, requesting carriers may not obtain new DS1 loops as unbundled network elements.

(5) DS3 loops. (i) Subject to the cap described in paragraph (a)(5)(ii) of this section, an incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS3 loop on an unbundled basis to any building not served by a wire center with at least 38,000 business lines and at least four fiber-based collocators. Once a wire center exceeds both of these thresholds, no future DS3 loop unbundling will be required in that wire center. A DS3 loop is a digital local loop having a total digital signal speed of 44.736 megabytes per second.

(ii) Cap on unbundled DS3 loop circuits. A requesting telecommunications carrier may obtain a maximum of a single unbundled DS3 loop to any single building in which DS3 loops are available as unbundled loops.

(iii) Transition period for DS3 loop circuits. For a 12-month period beginning on the effective date of the Triennial Review Remand Order, any DS3 loop UNEs that a competitive LEC leases from the incumbent LEC as of that date, but which the incumbent LEC is not obligated to unbundle pursuant to paragraphs (a)(5)(i) or (a)(5)(ii) of this section, shall be available for lease from the incumbent LEC at a rate equal to the higher of 115% of the rate the requesting carrier paid for the loop element on June 15, 2004, or, 115% of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that loop element. Where incumbent LECs are not required to provide unbundled DS3 loops pursuant to paragraphs (a)(5)(i) or (a)(5)(ii) of this section, requesting carriers may not obtain new DS3 loops as unbundled network elements.

(6) Dark fiber loops. (i) An incumbent LEC is not required to provide requesting telecommunications carriers with access to a dark fiber loop on an unbundled basis. Dark fiber is fiber within an existing fiber optic cable that has not yet been activated through optronics to render it capable of carrying communications services.

(ii) Transition period for dark fiber loop circuits. For an 18-month period beginning on the effective date of the Triennial Review Remand Order, any dark fiber loop UNEs that a competitive LEC leases from the incumbent LEC as of that date shall be available for lease from the incumbent LEC at a rate equal to the higher of 115% of the rate the requesting carrier paid for the loop element on June 15, 2004, or, 115% of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that loop element. Requesting carriers may not obtain new dark fiber loops as unbundled network elements.

(7) Routine network modifications. (i) An incumbent LEC shall make all routine network modifications to unbundled loop facilities used by

requesting telecommunications carriers where the requested loop facility has already been constructed. An incumbent LEC shall perform these routine network modifications to unbundled loop facilities in a nondiscriminatory fashion, without regard to whether the loop facility being accessed was constructed on behalf, or in accordance with the specifications, of any carrier.

(ii) A routine network modification is an activity that the incumbent LEC regularly undertakes for its own customers. Routine network modifications include, but are not limited to, rearranging or splicing of cable; adding an equipment case; adding a doubler or repeater; adding a smart jack; installing a repeater shelf; adding a line card; deploying a new multiplexer or reconfiguring an existing multiplexer; and attaching electronic and other equipment that the incumbent LEC ordinarily attaches to a DS1 loop to activate such loop for its own customer. They also include activities needed to enable a requesting telecommunications carrier to obtain access to a dark fiber loop. Routine network modifications may entail activities such as accessing manholes, deploying bucket trucks to reach aerial cable, and installing equipment casings. Routine network modifications do not include the construction of a new loop, or the installation of new aerial or buried cable for a requesting telecommunications carrier.

(8) Engineering policies, practices, and procedures. An incumbent LEC shall not engineer the transmission capabilities of its network in a manner, or engage in any policy, practice, or procedure, that disrupts or degrades access to a local loop or subloop, including the time division multiplexing-based features, functions, and capabilities of a hybrid loop, for which a requesting telecommunications carrier may obtain or has obtained access pursuant to paragraph (a) of this section.

(b) Subloops. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to subloops on an unbundled basis in accordance with section 251(c)(3) of the Act and this part and as set forth in paragraph (b) of this section.

(1) Copper subloops. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a copper subloop on an unbundled basis. A copper subloop is a portion of a copper loop, or hybrid loop, comprised entirely of copper wire or copper cable that acts as a transmission facility between any point of technically feasible access in an incumbent LEC's outside plant, including inside wire owned or controlled by the incumbent LEC, and the end-user customer premises. A copper subloop includes all intermediate devices (including repeaters and load coils) used to establish a transmission path between a point of technically feasible access and the demarcation point at the end-user customer premises, and includes the features, functions, and capabilities of the copper loop. Copper subloops include two-wire and four-wire analog voice-grade subloops as well as two-wire and four-wire

subloops conditioned to transmit the digital signals needed to provide digital subscriber line services, regardless of whether the subloops are in service or held as spares.

(i) Point of technically feasible access. A point of technically feasible access is any point in the incumbent LEC's outside plant where a technician can access the copper wire within a cable without removing a splice case. Such points include, but are not limited to, a pole or pedestal, the serving area interface, the network interface device, the minimum point of entry, any remote terminal, and the feeder/distribution interface. An incumbent LEC shall, upon a site-specific request, provide access to a copper subloop at a splice near a remote terminal. The incumbent LEC shall be compensated for providing this access in accordance with Sec. Sec. 51.501 through 51.515.

(ii) Rules for collocation. Access to the copper subloop is subject to the Commission's collocation rules at Sec. Sec. 51.321 and 51.323.

(2) Subloops for access to multiunit premises wiring. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to the subloop for access to multiunit premises wiring on an unbundled basis regardless of the capacity level or type of loop that the requesting telecommunications carrier seeks to provision for its customer. The subloop for access to multiunit premises wiring is defined as any portion of the loop that it is technically feasible to access at a terminal in the incumbent LEC's outside plant at or near a multiunit premises. One category of this subloop is inside wire, which is defined for purposes of this section as all loop plant owned or controlled by the incumbent LEC at a multiunit customer premises between the minimum point of entry as defined in Sec. 68.105 of this chapter and the point of demarcation of the incumbent LEC's network as defined in Sec. 68.3 of this chapter.

(i) Point of technically feasible access. A point of technically feasible access is any point in the incumbent LEC's outside plant at or near a multiunit premises where a technician can access the wire or fiber within the cable without
removing a splice case to reach the wire or fiber within to access the wiring in the multiunit premises. Such points include, but are not limited to, a pole or pedestal, the network interface device, the minimum point of entry, the single point of interconnection, and the feeder/distribution interface.

(ii) Single point of interconnection. Upon notification by a requesting telecommunications carrier that it requests interconnection at a multiunit premises where the incumbent LEC owns, controls, or leases wiring, the incumbent LEC shall provide a single point of interconnection that is suitable for use by multiple carriers. This obligation is in addition to the incumbent LEC's obligations, under paragraph (b)(2) of this section, to provide nondiscriminatory access to a subloop for access to multiunit premises wiring, including any inside

wire, at any technically feasible point. If the parties are unable to negotiate rates, terms, and conditions under which the incumbent LEC will provide this single point of interconnection, then any issues in dispute regarding this obligation shall be resolved in state proceedings under section 252 of the Act.

(3) Other subloop provisions--(i) Technical feasibility. If parties are unable to reach agreement through voluntary negotiations as to whether it is technically feasible, or whether sufficient space is available, to unbundle a copper subloop or subloop for access to multiunit premises wiring at the point where a telecommunications carrier requests, the incumbent LEC shall have the burden of demonstrating to the state commission, in state proceedings under section 252 of the Act, that there is not sufficient space available, or that it is not technically feasible to unbundle the subloop at the point requested.

(ii) Best practices. Once one state commission has determined that it is technically feasible to unbundle subloops at a designated point, an incumbent LEC in any state shall have the burden of demonstrating to the state commission, in state proceedings under section 252 of the Act, that it is not technically feasible, or that sufficient space is not available, to unbundle its own loops at such a point.

(c) Network interface device. Apart from its obligation to provide the network interface device functionality as part of an unbundled loop or subloop, an incumbent LEC also shall provide nondiscriminatory access to the network interface device on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part. The network interface device element is a stand-alone network element and is defined as any means of interconnection of customer premises wiring to the incumbent LEC's distribution plant, such as a cross-connect device used for that purpose. An incumbent LEC shall permit a requesting telecommunications carrier to connect its own loop facilities to on-premises wiring through the incumbent LEC's network interface device, or at any other technically feasible point.

(d) Local circuit switching. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to local circuit switching, including tandem switching, on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part and as set forth in paragraph (d) of this section.

(1) Definition. Local circuit switching is defined as follows:

(i) Local circuit switching encompasses all line-side and trunk-side facilities, plus the features, functions, and capabilities of the switch. The features, functions, and capabilities of the switch shall include the basic switching function of connecting lines to lines, lines to trunks, trunks to lines, and trunks to trunks.

(ii) Local circuit switching includes all vertical features that the switch is capable of providing, including custom calling, custom local

area signaling services features, and Centrex, as well as any technically feasible customized routing functions.

(2) DS0 capacity (i.e., mass market) determinations. (i) An incumbent LEC is not required to provide access to local circuit switching on an unbundled basis to requesting telecommunications carriers for the purpose of serving end-user customers using DS0 capacity loops.

(ii) Each requesting telecommunications carrier shall migrate its embedded base of end-user customers off of the unbundled local circuit switching element to an alternative arrangement within 12 months of the effective date of the Triennial Review Remand Order.

(iii) Notwithstanding paragraph (d)(2)(i) of this section, for a 12-month period from the effective date of the Triennial Review Remand Order, an incumbent LEC shall provide access to local circuit switching on an unbundled basis for a requesting carrier to serve its embedded base of end-user customers. The price for unbundled local circuit switching in combination with unbundled DS0 capacity loops and shared transport obtained pursuant to this paragraph shall be the higher of the rate at which the requesting carrier obtained that combination of network elements on June 15, 2004 plus one dollar, or, the rate the state public utility commission establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that combination of network elements, plus one dollar. Requesting carriers may not obtain new local switching as an unbundled network element.

(3) DS1 capacity and above (i.e., enterprise market) determinations. An incumbent LEC is not required to provide access to local circuit switching on an unbundled basis to requesting telecommunications carriers for the purpose of serving end-user customers using DS1 capacity and above loops except where the state commission petitions this Commission for waiver of this finding in accordance with the conditions set forth in paragraph (d)(3)(i) of this section and the Commission grants such waiver.

(i) State commission inquiry. In its petition, a state commission wishing to rebut the Commission's finding should petition the Commission to show that requesting telecommunications carriers are impaired without access to local circuit switching to serve end users using DS1 capacity and above loops in a particular geographic market as defined in accordance with paragraph (d)(2)(i) of this section if it finds that operational or economic barriers exist in that market.

(A) In making this showing, the state commission shall consider the following operational characteristics: incumbent LEC performance in provisioning loops; difficulties associated with obtaining collocation space due to lack of space or delays in provisioning by the incumbent LEC; and the difficulties associated with obtaining cross-connects in the incumbent LEC's wire center.

(B) In making this showing, the state commission shall consider the following economic characteristics: the cost of entry into a particular market, including those caused by both operational and economic barriers to entry; requesting telecommunications carriers' potential revenues from serving enterprise customers in that market, including all likely revenues to be gained from entering that market; the prices requesting telecommunications carriers are likely to be able to charge in that market, based on a consideration of the prevailing retail rates the incumbent LEC charges to the different classes of customers in the different parts of the state.

(ii) Transitional four-line carve-out. Until the state commission completes the review described in paragraph (b)(2)(iii)(B)(4) of this section, an incumbent LEC shall comply with the four-line ``carve-out'' for unbundled switching established in Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, CC Docket No. 96-98, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 15 FCC Rcd 3822-31, paras. 276-98 (1999), reversed and remanded in part sub. nom. United States Telecom Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002).

(A) DS1 capacity and above end-user transition. Each requesting telecommunications carrier shall transfer its end-user customers served using DS1 and above capacity loops and unbundled local circuit switching to an alternative arrangement within 90 days from the end of the 90-day state commission consideration period set forth in paragraph (d)(5)(i), unless a longer period is necessary to comply with a ``change of law'' provision in an applicable interconnection agreement.

(4) Other elements to be unbundled. Elements relating to the local circuit switching element shall be made available on an unbundled basis to a requesting carrier to the extent that the requesting carrier is entitled to unbundled local circuit switching as set forth in paragraph (d)(2) of this section.

(i) An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to signaling, call-related databases, and shared transport facilities on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part, to the extent that local circuit switching is required to be made available pursuant to paragraph (d)(2)(iii) of this section. These elements are defined as follows:

(A) Signaling networks. Signaling networks include, but are not limited to, signaling links and signaling transfer points.

(B) Call-related databases. Call-related databases are defined as databases, other than operations support systems, that are used in signaling networks for billing and collection, or the transmission, routing, or other provision of a telecommunications service. Where a requesting telecommunications carrier purchases unbundled local circuit switching from an incumbent LEC, an incumbent LEC shall allow a

requesting telecommunications carrier to use the incumbent LEC's service control point element in the same manner, and via the same signaling links, as the incumbent LEC itself.

(1) Call-related databases include, but are not limited to, the calling name database, 911 database, E911 database, line information database, toll free calling database, advanced intelligent network databases, and downstream number portability databases by means of physical access at the signaling transfer point linked to the unbundled databases.

(2) Service management systems are defined as computer databases or systems not part of the public switched network that interconnect to the service control point and send to the service control point information and call processing instructions needed for a network switch to process and complete a telephone call, and provide a telecommunications carrier with the capability of entering and storing data regarding the processing and completing of a telephone call. Where a requesting telecommunications carrier purchases unbundled local circuit switching from an incumbent LEC, the incumbent LEC shall allow a requesting telecommunications carrier to use the incumbent LEC's service management systems by providing a requesting telecommunications carrier with the information necessary to enter correctly, or format for entry, the information relevant for input into the incumbent LEC's service management system, including access to design, create, test, and deploy advanced intelligent network-based services at the service management system, through a service creation environment, that the incumbent LEC provides to itself.

(3) An incumbent LEC shall not be required to unbundle the services created in the advanced intelligent network platform and architecture that qualify for proprietary treatment.

(C) Shared transport. Shared transport is defined as the transmission facilities shared by more than one carrier, including the incumbent LEC, between end office switches, between end office switches and tandem switches, and between tandem switches, in the incumbent LEC network.

(ii) An incumbent LEC shall provide a requesting telecommunications carrier nondiscriminatory access to operator services and directory assistance on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part, to the extent that local circuit switching is required to be unbundled by a state commission, if the incumbent LEC does not provide that requesting telecommunications carrier with customized routing, or a compatible signaling protocol, necessary to use either a competing provider's operator services and directory assistance platform or the requesting telecommunications carrier's own platform. Operator services are any automatic or live assistance to a customer to arrange for billing or completion, or both, of a telephone call. Directory assistance is a service that allows

subscribers to retrieve telephone numbers of other subscribers.

(5) State commission proceedings. A state commission shall complete the proceedings necessary to satisfy the requirements in paragraphs (d)(2) and (d)(3) of this section in accordance with paragraphs (d)(5)(i) and (d)(5)(ii) of this section.

(i) Timing. A state commission shall complete any initial review applying the triggers and criteria in paragraph (d)(2) of this section within nine months from the effective date of the Commission's Triennial Review Order. A state commission wishing to rebut the Commission's finding of non-impairment for DS1 and above enterprise switches must file a petition with the Commission in accordance with paragraph (d)(3) of this section within 90 days from that effective date.

(ii) Continuing review. A state commission shall complete any subsequent review applying these triggers and criteria within six months of the filing of a petition or other pleading to conduct such a review.

(e) Dedicated transport. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to dedicated transport on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part, as set forth in paragraphs (e) through (e)(4) of this section. A ``route'' is a transmission path between one of an incumbent LEC's wire centers or switches and another of the incumbent LEC's wire centers or switches. A route between two points (e.g., wire center or switch ``A'' and wire center or switch ``Z'') may pass through one or more intermediate wire centers or switches (e.g., wire center or switch ``X''). Transmission paths between identical end points (e.g., wire center or switch ``A'' and wire center or switch ``Z'') are the same ``route,'' irrespective of whether they pass through the same intermediate wire centers or switches, if any.

(1) Definition. For purposes of this section, dedicated transport includes incumbent LEC transmission facilities between wire centers or switches owned by incumbent LECs, or between wire centers or switches owned by incumbent LECs and switches owned by requesting telecommunications carriers, including, but not limited to, DS1-, DS3-, and OCn-capacity level services, as well as dark fiber, dedicated to a particular customer or carrier.

(2) Availability. (i) Entrance facilities. An incumbent LEC is not obligated to provide a requesting carrier with unbundled access to dedicated transport that does not connect a pair of incumbent LEC wire centers.

(ii) Dedicated DS1 transport. Dedicated DS1 transport shall be made available to requesting carriers on an unbundled basis as set forth below. Dedicated DS1 transport consists of incumbent LEC interoffice transmission facilities that have a total digital signal speed of 1.544 megabytes per second and are dedicated to a particular customer or carrier.

(A) General availability of DS1 transport. Incumbent LECs shall

unbundle DS1 transport between any pair of incumbent LEC wire centers except where, through application of tier classifications described in paragraph (e)(3) of this section, both wire centers defining the route are Tier 1 wire centers. As such, an incumbent LEC must unbundle DS1 transport if a wire center at either end of a requested route is not a Tier 1 wire center, or if neither is a Tier 1 wire center.

(B) Cap on unbundled DS1 transport circuits. A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis.

(C) Transition period for DS1 transport circuits. For a 12-month period beginning on the effective date of the Triennial Review Remand Order, any DS1 dedicated transport UNE that a competitive LEC leases from the incumbent LEC as of that date, but which the incumbent LEC is not obligated to unbundle pursuant to paragraphs (e)(2)(ii)(A) or (e)(2)(ii)(B) of this section, shall be available for lease from the incumbent LEC at a rate equal to the higher of 115 percent of the rate the requesting carrier paid for the dedicated transport element on June 15,
2004, or, 115 percent of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that dedicated transport element. Where incumbent LECs are not required to provide unbundled DS1 transport pursuant to paragraphs (e)(2)(ii)(A) or (e)(2)(ii)(B) of this section, requesting carriers may not obtain new DS1 transport as unbundled network elements.

(iii) Dedicated DS3 transport. Dedicated DS3 transport shall be made available to requesting carriers on an unbundled basis as set forth below. Dedicated DS3 transport consists of incumbent LEC interoffice transmission facilities that have a total digital signal speed of 44.736 megabytes per second and are dedicated to a particular customer or carrier.

(A) General availability of DS3 transport. Incumbent LECs shall unbundle DS3 transport between any pair of incumbent LEC wire centers except where, through application of tier classifications described in paragraph (e)(3) of this section, both wire centers defining the route are either Tier 1 or Tier 2 wire centers. As such, an incumbent LEC must unbundle DS3 transport if a wire center on either end of a requested route is a Tier 3 wire center.

(B) Cap on unbundled DS3 transport circuits. A requesting telecommunications carrier may obtain a maximum of 12 unbundled DS3 dedicated transport circuits on each route where DS3 dedicated transport is available on an unbundled basis.

(C) Transition period for DS3 transport circuits. For a 12-month period beginning on the effective date of the Triennial Review Remand Order, any DS3 dedicated transport UNE that a competitive LEC leases

from the incumbent LEC as of that date, but which the incumbent LEC is not obligated to unbundle pursuant to paragraphs (e)(2)(iii)(A) or (e)(2)(iii)(B) of this section, shall be available for lease from the incumbent LEC at a rate equal to the higher of 115 percent of the rate the requesting carrier paid for the dedicated transport element on June 15, 2004, or, 115 percent of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that dedicated transport element. Where incumbent LECs are not required to provide unbundled DS3 transport pursuant to paragraphs (e)(2)(iii)(A) or (e)(2)(iii)(B) of this section, requesting carriers may not obtain new DS3 transport as unbundled network elements.

(iv) Dark fiber transport. Dedicated dark fiber transport shall be made available to requesting carriers on an unbundled basis as set forth below. Dark fiber transport consists of unactivated optical interoffice transmission facilities.

(A) General availability of dark fiber transport. Incumbent LECs shall unbundle dark fiber transport between any pair of incumbent LEC wire centers except where, though application of tier classifications described in paragraph (e)(3) of this section, both wire centers defining the route are either Tier 1 or Tier 2 wire centers. As such, an incumbent LEC must unbundle dark fiber transport if a wire center on either end of a requested route is a Tier 3 wire center.

(B) Transition period for dark fiber transport circuits. For an 18-month period beginning on the effective date of the Triennial Review Remand Order, any dark fiber dedicated transport UNE that a competitive LEC leases from the incumbent LEC as of that date, but which the incumbent LEC is not obligated to unbundle pursuant to paragraphs (e)(2)(iv)(A) or (e)(2)(iv)(B) of this section, shall be available for lease from the incumbent LEC at a rate equal to the higher of 115 percent of the rate the requesting carrier paid for the dedicated transport element on June 15, 2004, or, 115 percent of the rate the state commission has established or establishes, if any, between June 16, 2004, and the effective date of the Triennial Review Remand Order, for that dedicated transport element. Where incumbent LECs are not required to provide unbundled dark fiber transport pursuant to paragraphs (e)(2)(iv)(A) or (e)(2)(iv)(B) of this section, requesting carriers may not obtain new dark fiber transport as unbundled network elements.

(3) Wire center tier structure. For purposes of this section, incumbent LEC wire centers shall be classified into three tiers, defined as follows:

(i) Tier 1 wire centers are those incumbent LEC wire centers that contain at least four fiber-based collocators, at least 38,000 business lines, or both. Tier 1 wire centers also are those incumbent LEC tandem switching locations that have no line-side switching facilities, but

nevertheless serve as a point of traffic aggregation accessible by competitive LECs. Once a wire center is determined to be a Tier 1 wire center, that wire center is not subject to later reclassification as a Tier 2 or Tier 3 wire center.

(ii) Tier 2 wire centers are those incumbent LEC wire centers that are not Tier 1 wire centers, but contain at least 3 fiber-based collocators, at least 24,000 business lines, or both. Once a wire center is determined to be a Tier 2 wire center, that wire center is not subject to later reclassification as a Tier 3 wire center.

(iii) Tier 3 wire centers are those incumbent LEC wire centers that do not meet the criteria for Tier 1 or Tier 2 wire centers.

(4) Routine network modifications. (i) An incumbent LEC shall make all routine network modifications to unbundled dedicated transport facilities used by requesting telecommunications carriers where the requested dedicated transport facilities have already been constructed. An incumbent LEC shall perform all routine network modifications to unbundled dedicated transport facilities in a nondiscriminatory fashion, without regard to whether the facility being accessed was constructed on behalf, or in accordance with the specifications, of any carrier.

(ii) A routine network modification is an activity that the incumbent LEC regularly undertakes for its own customers. Routine network modifications include, but are not limited to, rearranging or splicing of cable; adding an equipment case; adding a doubler or repeater; installing a repeater shelf; and deploying a new multiplexer or reconfiguring an existing multiplexer. They also include activities needed to enable a requesting telecommunications carrier to light a dark fiber transport facility. Routine network modifications may entail activities such as accessing manholes, deploying bucket trucks to reach aerial cable, and installing equipment casings. Routine network modifications do not include the installation of new aerial or buried cable for a requesting telecommunications carrier.

(f) 911 and E911 databases. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to 911 and E911 databases on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part.

(g) Operations support systems. An incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to operations support systems on an unbundled basis, in accordance with section 251(c)(3) of the Act and this part. Operations support system functions consist of pre-ordering, ordering, provisioning, maintenance and repair, and billing functions supported by an incumbent LEC's databases and information. An incumbent LEC, as part of its duty to provide access to the pre-ordering function, shall provide the requesting telecommunications carrier with nondiscriminatory access to the same detailed information about the loop that is available to the incumbent LEC.

❖ Sec. 51.503  General pricing standard.

(a) An incumbent LEC shall offer elements to requesting
telecommunications carriers at rates, terms, and conditions that are
just, reasonable, and nondiscriminatory.

(b) An incumbent LEC's rates for each element it offers shall comply
with the rate structure rules set forth in Sec. Sec. 51.507 and 51.509,
and shall be established, at the election of the state commission--

(1) Pursuant to the forward-looking economic cost-based pricing
methodology set forth in Sec. Sec. 51.505 and 51.511; or

(2) Consistent with the proxy ceilings and ranges set forth in Sec.
51.513.

(c) The rates that an incumbent LEC assesses for elements shall not
vary on the basis of the class of customers served by the requesting
carrier, or on the type of services that the requesting carrier
purchasing such elements uses them to provide.


❖ Sec. 51.505  Forward-looking economic cost.

(a) In general. The forward-looking economic cost of an element
equals the sum of:

(1) The total element long-run incremental cost of the element, as
described in paragraph (b); and

(2) A reasonable allocation of forward-looking common costs, as
described in paragraph (c).

(b) Total element long-run incremental cost. The total element long-
run incremental cost of an element is the forward-looking cost over the
long run of the total quantity of the facilities and functions that are
directly attributable to, or reasonably identifiable as incremental to,
such element, calculated taking as a given the incumbent LEC's provision
of other elements.

(1) Efficient network configuration. The total element long-run
incremental cost of an element should be measured based on the use of
the most efficient telecommunications technology currently available and
the lowest cost network configuration, given the existing location of
the incumbent LEC's wire centers.

(2) Forward-looking cost of capital. The forward-looking cost of
capital shall be used in calculating the total element
long-run incremental cost of an element.

(3) Depreciation rates. The depreciation rates used in calculating
forward-looking economic costs of elements shall be economic
depreciation rates.

(c) Reasonable allocation of forward-looking common costs--(1)
Forward-looking common costs. Forward-looking common costs are economic

costs efficiently incurred in providing a group of elements or services (which may include all elements or services provided by the incumbent LEC) that cannot be attributed directly to individual elements or services.

(2) Reasonable allocation. (i) The sum of a reasonable allocation of forward-looking common costs and the total element long-run incremental cost of an element shall not exceed the stand-alone costs associated with the element. In this context, stand-alone costs are the total forward-looking costs, including corporate costs, that would be incurred to produce a given element if that element were provided by an efficient firm that produced nothing but the given element.

(ii) The sum of the allocation of forward-looking common costs for all elements and services shall equal the total forward-looking common costs, exclusive of retail costs, attributable to operating the incumbent LEC's total network, so as to provide all the elements and services offered.

(d) Factors that may not be considered. The following factors shall not be considered in a calculation of the forward-looking economic cost of an element:

(1) Embedded costs. Embedded costs are the costs that the incumbent LEC incurred in the past and that are recorded in the incumbent LEC's books of accounts;

(2) Retail costs. Retail costs include the costs of marketing, billing, collection, and other costs associated with offering retail telecommunications services to subscribers who are not telecommunications carriers, described in Sec. 51.609;

(3) Opportunity costs. Opportunity costs include the revenues that the incumbent LEC would have received for the sale of telecommunications services, in the absence of competition from telecommunications carriers that purchase elements; and

(4) Revenues to subsidize other services. Revenues to subsidize other services include revenues associated with elements or telecommunications service offerings other than the element for which a rate is being established.

(e) Cost study requirements. An incumbent LEC must prove to the state commission that the rates for each element it offers do not exceed the forward-looking economic cost per unit of providing the element, using a cost study that complies with the methodology set forth in this section and Sec. 51.511.

(1) A state commission may set a rate outside the proxy ranges or above the proxy ceilings described in Sec. 51.513 only if that commission has given full and fair effect to the economic cost based pricing methodology described in this section and Sec. 51.511 in a state proceeding that meets the requirements of paragraph (e)(2) of this section.

(2) Any state proceeding conducted pursuant to this section shall

provide notice and an opportunity for comment to affected parties and shall result in the creation of a written factual record that is sufficient for purposes of review. The record of any state proceeding in which a state commission considers a cost study for purposes of establishing rates under this section shall include any such cost study.

❖ Sec. 51.507  General rate structure standard.

(a) Element rates shall be structured consistently with the manner in which the costs of providing the elements are incurred.

(b) The costs of dedicated facilities shall be recovered through flat-rated charges.

(c) The costs of shared facilities shall be recovered in a manner that efficiently apportions costs among users. Costs of shared facilities may be apportioned either through usage-sensitive charges or capacity-based flat-rated charges, if the state commission finds that such rates reasonably reflect the costs imposed by the various users.

(d) Recurring costs shall be recovered through recurring charges, unless an incumbent LEC proves to a state commission that such recurring costs are de minimis. Recurring costs shall be considered de minimis when the costs of administering the recurring charge would be excessive in relation to the amount of the recurring costs.

(e) State commissions may, where reasonable, require incumbent LECs to recover nonrecurring costs through recurring charges over a reasonable period of time. Nonrecurring charges shall be allocated efficiently among requesting telecommunications carriers, and shall not permit an incumbent LEC to recover more than the total forward-looking economic cost of providing the applicable element.

(f) State commissions shall establish different rates for elements in at least three defined geographic areas within the state to reflect geographic cost differences.

(1) To establish geographically-deaveraged rates, state commissions may use existing density-related zone pricing plans described in Sec. 69.123 of this chapter, or other such cost-related zone plans established pursuant to state law.

(2) In states not using such existing plans, state commissions must create a minimum of three cost-related rate zones.

❖ Sec. 51.509  Rate structure standards for specific elements.

In addition to the general rules set forth in Sec. 51.507, rates for specific elements shall comply with the following rate structure rules.

(a) Local loop and subloop. Loop and subloop costs shall be

recovered through flat-rated charges.

(b) Local switching. Local switching costs shall be recovered through a combination of a flat-rated charge for line ports and one or more flat-rated or per-minute usage charges for the switching matrix and for trunk ports.

(c) Dedicated transmission links. Dedicated transmission link costs shall be recovered through flat-rated charges.

(d) Shared transmission facilities between tandem switches and end offices. The costs of shared transmission facilities between tandem switches and end offices may be recovered through usage-sensitive charges, or in another manner consistent with the manner that the incumbent LEC incurs those costs.

(e) Tandem switching. Tandem switching costs may be recovered through usage-sensitive charges, or in another manner consistent with the manner that the incumbent LEC incurs those costs.

(f) Signaling and call-related database services. Signaling and call-related database service costs shall be usage-sensitive, based on either the number of queries or the number of messages, with the exception of the dedicated circuits known as signaling links, the cost of which shall be recovered through flat-rated charges.

(g) Collocation. Collocation costs shall be recovered consistent with the rate structure policies established in the Expanded Interconnection proceeding, CC Docket No. 91-141.

(h) Network interface device. An incumbent LEC must establish a price for the network interface device when that unbundled network element is purchased on a stand-alone basis pursuant to Sec. 51.319(c).


❖ Sec. 51.511  Forward-looking economic cost per unit.


a) The forward-looking economic cost per unit of an element equals the forward-looking economic cost of the element, as defined in Sec. 51.505, divided by a reasonable projection of the sum of the total number of units of the element that the incumbent LEC is likely to provide to requesting telecommunications carriers and the total number of units of the element that the incumbent LEC is likely to use in offering its own services, during a reasonable measuring period.

(b)(1) With respect to elements that an incumbent LEC offers on a flat-rate basis, the number of units is defined as the discrete number of elements (e.g., local loops or local switch ports) that the incumbent LEC uses or provides.

(2) With respect to elements that an incumbent LEC offers on a usage-sensitive basis, the number of units is defined as the unit of measurement of the
usage (e.g., minutes of use or call-related database queries) of the element.