Page 114
1 customers that Verizon has had problems with this
2 billing of this USOC?
3    A  I haven't, no.
4    Q  Did you write the Verizon position
5 statement on this subject?
6    A  No.
7    Q  Have you seen that position statement?
8    A  Yes.
9    Q  Do you recall the first sentence of that
10 position statement says that Lightwave does not
11 dispute that Verizon provided interoffice service?
12    A  Perhaps I should refresh? Is it in an
13 exhibit?
14    Q  Certainly. It's in the Arbitrator's
15 notebook?
16    A  Do you have an exhibit number?
17    Q  It's not an exhibit. It's in the
18 Arbitrator's notebook.
19    A  Thank you.
20    Q  Do you agree with that first sentence?
21    A  Perhaps I would have worded it
22 differently, but, yes.

Page 115
1    Q  What then does the dispute involve that's
2 at issue in this arbitration?
3    A  My understanding, based on the documents
4 I've seen is the provisioning of the FX service on
5 a hard wired versus a non-hard wired basis.
6    Q  Isn't it Lightwave's position that
7 Verizon has not provided interoffice service in
8 DC, Maryland and Virginia?
9    A  Of a not provided working --
10    Q  Interoffice facility service in DC,
11 Maryland and Virginia?
12    A  I believe so. If there's something I
13 could be looking at.
14    Q  I believe you testified to the existence
15 of soft FX service or sometimes referred to as
16 cheap FX service, is that correct?
17    A  Soft FX, I wouldn't use that other term
18 although I've seen it used before.
19    Q  Do they relate to the same item?
20    A  It's a type of foreign exchange service,
21 yes.
22    Q  Are cheap FX and soft FX interchangeable

Page 116
1 in your view?
2    A  To the best of my knowledge. I would use
3 the term soft FX or engineered FX. I believe
4 others use the term cheap FX.
5    Q  Are you familiar with regulatory
6 requirements as they relate to the billing of
7 elements, are you not?
8    A  I would say in general, yes. I'm not
9 sure I understand the question or the application.
10    Q  Is Verizon authorized to bill for
11 elements that it does not provide?
12    A  Are we talking under advantage or prior?
13    Q  Both.
14    A  I think we are authorized to bill for the
15 service we provide to describe the rates are
16 described that are applicable to that service.
17    Q  Prior to July 1st, 2005, Verizon has
18 provided network elements to carriers such as
19 Lightwave, is that correct?
20    A  That's correct.
21    Q  And Verizon can bill for elements it's
22 providing?

Page 117
1    A  That's correct.
2    Q  Could Verizon bill a carrier for an
3 element it was not providing?
4        MR. CORCORAN: Objection, vague,
5 elements.
6 BY MR. KLEIN:
7    Q  Any network element it was not providing?
8    A  My understanding is we would bill for
9 elements that were provided, yes.
10    Q  That's not my question. Could you bill
11 for an unbundled network that Verizon was not
12 providing?
13    A  I don't believe so.
14    Q  Would Verizon be authorized to bill for
15 an interoffice facility if it was not actually
16 providing an interoffice facility to a wholesale
17 customer?
18    A  No.
19    Q  Does Verizon actually physically provide
20 interoffice facilities in connection with soft FX
21 service?
22    A  Hard wire dedicated facility? No. Could

Page 118

1  you repeat the question.
2      Q  Does Verizon actually physically provide
3  interoffice facilities in connection with soft FX
4  service?
5      A  Yes.
6      Q  Interoffice facility being a facility
7  between two central offices.
8          MR. CORCORAN: Objection, is Counsel's
9  question presupposing a definition?
10 BY MR. KLEIN:
11     Q  Let me back up. Do you understand what
12 an interoffice facility is?
13     A  Yes.
14     Q  Refresh us what that means?
15     A  Interoffice facility is a facility
16 between two Verizon central offices, two or more
17 central offices.
18     Q  Okay. So is it fair to say it's a link
19 between one central office and another Verizon
20 central office?
21     A  In a way.
22     Q  When Verizon provides soft interoffice

Page 119

1  service, is Verizon providing that between two
2  separate offices?
3      A  They are providing usage.
4      Q  The question is Verizon actually
5  providing an interoffice facility connecting two
6  central offices?
7          MR. CORCORAN: Objection, asked and
8  answered.
9          MR. KLEIN: It was not answered.
10         ARBITRATOR BONELLO: Objection overruled.
11         THE WITNESS: It's provided on a soft or
12 a usage basis.
13 BY MR. KLEIN:
14     Q  I'm not asking about functionality. I'm
15 talking about whether Verizon is actually
16 providing the transport piece between one central
17 office and another central office?
18         MR. CORCORAN: Objection, asked and
19 answered.
20         ARBITRATOR BONELLO: Overruled.
21         THE WITNESS: No.
22 BY MR. KLEIN:

Page 120

1      Q  Mr. Sitro, let me ask you to address if
2  you can NPU, non-published listings.
3      A  Okay.
4      Q  Your testimony I believe is that you
5  investigated this claim, Lightwave's claim?
6      A  Yes.
7      Q  What's the period covered by Lightwave's
8  claim in this arbitration -- I'm sorry, Verizon's
9  claim in this arbitration, this is a counterclaim
10 asserted by Verizon, you're aware of that?
11     A  Yes.
12     Q  What's the period covered by Verizon's
13 counterclaim in NPU?
14     A  January 2004 through either May 31st or
15 June 31st, 2006.
16     Q  And what's the amount of Verizon's
17 counterclaim?
18     A  Let me reference it just a moment.
19     Q  Sure.
20     A  For NPU?
21     Q  Yes, according to the Verizon
22 counterclaim document, which I believe is Verizon

Page 121

1  Exhibit 2, if I'm not mistaken.
2      A  $581,006.76.
3      Q  Did Verizon actually bill Lightwave for
4  NPU during the two and a half year period you
5  described?
6      A  I didn't validate the total amount.
7      Q  I'm sorry, you didn't?
8      A  I didn't validate the total amount over
9  that period.
10     Q  So you wouldn't know then if the amount
11 of the counterclaim exceeded the amount that was
12 actually billed to Lightwave?
13     A  No.
14     Q  I believe that subsequent to the Verizon
15 filing of a counterclaim for NPU there's been an
16 admission that the counterclaim is erroneous, is
17 that accurate?
18     A  Erroneous meaning the amount?
19     Q  Yes.
20     A  Needs to be adjusted.
21     Q  Does that mean that the amount that
22 Verizon billed was incorrect?

31 (Pages 118 to 121)

Page 134

1 REALA?
2     A   With the exception of under the advantage
3 time period in Maryland, where the rate was not
4 applied properly.
5     Q   Are you talking now about the 100 and
6 some dollars that you just described?
7     A   I'm talking about, yeah, there was -- the
8 amount billed during the advantage period for this
9 charge was in Maryland $4.24. It should be $2.75.
10    Q   Apart from that small figure, less than
11 $200, did Verizon properly charge Lightwave for
12 suspension activities related to REALA?
13    A   Yeah.
14        MR. KLEIN: I have to object to these
15 questions because I believe that Verizon objected
16 to previously when this witness could not answer
17 billing related questions and the witness
18 indicated himself he could not answer billing
19 related questions.
20        ARBITRATOR BONELLO: Overruled.
21 BY MR. CORCORAN:
22    Q   Let me move on to the ULY3X USOC. You

Page 135

1 were asked some questions about whether Verizon
2 provided a wire link between offices when
3 providing FX services as soft FX. Do you remember
4 that general area of questioning?
5     A   Yes.
6     Q   Okay. Is there a software link that
7 Verizon provides to effect the FX transfer for
8 Lightwave?
9     A   I don't know if I would use the term
10 software link. But the software calls are treated
11 like they are from a foreign exchange area,
12 different rate area.
13    Q   Does anything in the contract between the
14 parties prevent Verizon from doing that?
15    A   I don't --
16        MR. KLEIN: I'm sorry, I have to object,
17 prevent Verizon from doing what?
18 BY MR. CORCORAN:
19    Q   From providing the service in that
20 fashion through software, does the WASA prevent
21 Verizon from preventing FX services via software?
22    A   I don't know that it does. I don't think

Page 136

1 so.
2     Q   Does the WASA make any distinction
3 between hard and -- the billing for hard and soft
4 FX?
5     A   It doesn't describe the term.
6     Q   Let me also ask you about -- you were
7 asked some questions on this topic of FX that
8 suggested that the dispute was only over soft FX.
9 Did you determine whether Lightwave in fact
10 withheld payments that were due but related to
11 hard FX?
12    A   Yes.
13    Q   And give a rough estimate of the
14 magnitude of Lightwave's withholding of payments
15 that even related to hard FX.
16        MR. KLEIN: I'd have to object. The
17 witness previously testified he's unaware of the
18 break down of the types of dispute at issue here.
19        ARBITRATOR BONELLO: Do you want to
20 respond to the objection?
21        MR. CORCORAN: I don't think that was his
22 testimony. I think it was -- that testimony

Page 137

1 related to jurisdictions or years. I think if
2 there's an overall hard and soft FX question he
3 can answer, he should be able to do that.
4         ARBITRATOR BONELLO: I'll allow the
5 question.
6         THE WITNESS: Can you restate it?
7 BY MR. KLEIN:
8     Q   In your review of the actual claims where
9 Lightwave has withheld payment for FX services,
10 did you find that some related to hard FX?
11    A   Yes.
12    Q   And roughly what was the dollar magnitude
13 of money that Lightwave withheld that related to
14 hard FX?
15    A   $28,000.
16    Q   You were asked some questions about the
17 USOC NPU and specifically whether you would be
18 surprised that -- whether you would be surprised
19 the amount Verizon billed for NPU exceeded or was
20 less than the amount that Verizon is now saying
21 it's owed to it for NPU services. Do you remember
22 that general area of questioning?



002480